## Hopkins's and Johnson's Appeal.

90   69
137  606
90   69
169  630
90   69
170   9
90  ·69
183  458

1. An insolvent corporation being indebted to its officers and directors, they executed the notes of the corporation in their own favor, and having obtained judgment by default, issued execution thereon. In the distribution of the proceeds of the sheriff's sale of the personal property of the corporation, *Held*, that this conduct of the officers was a fraud in law, which gave them no preference over general creditors in the distribution.

2. Under the provisions of the Act of April 7th 1870, sect. 1, where there is a sale of the personal property of an insolvent corporation, no preference is to be given to execution-creditors, but the distribution must be made as in cases of insolvency.

3. In making distribution of the proceeds of a sheriff's sale of the personal property of a corporation, it was agreed that the fund should be distributed by a master, as if a bill in equity had been filed by one of the claimants against the rest. The report of the master was filed, and it was again referred to him for correction. Other creditors then asked to be made parties to the supposed bill, and the court allowed the amendment. *Held*, that this was not error.

March 27th 1879. Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, WOODWARD, TRUNKEY and STERRETT, JJ.

Appeal from the Court of Common Pleas of *Chester county :* Of January Term 1879, No. 234.

Appeal of Ephraim Hopkins, M. D., and William C. Johnson, trustee, from the decree of the court distributing the proceeds of a sale of personal property of the Chester Valley Wheel and Axle Company.

The case was referred by agreement to J. Smith Futhey, Esq., as if to an examiner and master under a bill in equity, who found the facts as follows :

The Chester Valley Wheel and Axle Company, whose works were located at Downingtown, was incorporated under the Act of Assembly of July 18th 1863, in the month of October 1873. The stockholders were Edward Downing, Charles Downing, Dr. Ephraim Hopkins, J. Clemson Sharpless and Mrs. Martha Johnson, wife of W. C. Johnson. William C. Johnson was chosen president of the company, and so remained. Charles Downing was the first secretary and treasurer. He resigned January 1st 1874, when Dr. E. Hopkins was chosen secretary and treasurer, and so continued. The original directors were Edward Downing, William C. Johnson and J. T. Carpenter. The latter resigned January 31st 1874, and Charles Downing was elected a director in his stead. On April 15th 1875, William C. Johnson, Charles Downing, Dr. Hopkins and J. C Sharpless were elected directors. On May 29th 1875, Charles Downing resigned.

The authorized capital of the company was $20,000, divided into shares of $25 each, of which a patent right, represented by William C. Johnson, valued at $10,000, formed part. The other stock was held as follows: Charles Downing, $500, Edward Downing, $1500,

[Hopkins's and Johnson's Appeal.]

J. Clemson Sharpless, $3000, and Dr. E. Hopkins, $4850, leaving six shares untaken.

In the summer of 1874, the company, being in need of money, Dr. Hopkins borrowed from Charles Downing $4772.38, part or all of which he put into the company in the shape of stock and loans. The money was paid to Dr. Hopkins in instalments, and he gave his notes to Downing for the amounts as he received them. He also gave him as collateral security a mortgage for the same amount, $4772.38, which had been given to him (Hopkins) by his mother, secured on real estate belonging to her in Harford county, Maryland. On the 28th of December 1874, Charles Downing exchanged this loan, which he had made to Dr. Hopkins, for a judgment bond of the company, which was executed by William C. Johnson as president, and sealed with the seal of the company, and delivered in the presence of Dr. Hopkins, secretary, and F. B. Johnson. The notes held by Charles Downing against Dr. Hopkins were given up to him, and the mortgage referred to, which Downing held as collateral security, was assigned by him to the company, and became its property. This transaction appears to have been without any action on the part of the directors of the corporation.

This judgment bond was payable on demand, with interest, but required five months' notice in writing to be given to the president and secretary before it could be sued out. Judgment was entered on this bond in the Common Pleas of Chester county, January 11th 1875. On March 16th 1875, Downing gave notice according to the condition of the bond, that he required the moneys secured by it to be paid.

The company was indebted to Dr. Hopkins, William C. Johnson, trustee, J. C. Sharpless and others.

After this notice was given, and induced by it, a meeting of the directors of the company was held on May 13th 1875, at which the following resolution was adopted:

"The president was instructed to make an estimate of the indebtedness of the company, and to adjust all claims, and secure the same by notes of the corporation when demanded. On motion, the salaries of the president and secretary were fixed at eighty dollars per month, dating from February 1st 1874." Soon after this, the precise date not being given, notes were given sealed with the corporate seal, and signed by William C. Johnson, president, on behalf of the company, and attested by Dr. Hopkins, secretary and treasurer, as follows: To Dr. Hopkins, dated October 27th 1875, for $4000; to J. C. Sharpless, dated March 23d 1875, for $500; and to William C. Johnson, trustee, dated December 22d 1875, for $3395, these being the amounts agreed upon as due to these persons. These notes, it is explained by the evidence, were intended to be dated back as of the times when the money was due, and from which interest should be counted; but by mistake the year was written

"1875" instead of "1874," which was intended to be the year written on the notes. There were no persons present, so far as appears, at the adjustment of the amounts for which these notes were given, but the persons to whom they were given.

Suits were brought on all these notes June 7th 1875, and on the same day the writs of summons were served on Dr. Ephraim Hopkins, as secretary and treasurer. Judgments by default were taken on June 18th 1875, and executions issued on the same day, and levied on the personal property of the company, which was subsequently advertised by the sheriff for sale.

On the 5th of July proceedings on these executions were suspended, in pursuance of an agreement with Chas. Downing.

On Nov. 22d 1875, alias executions were issued on these three judgments, and the personal property of the company again levied on, and advertised for sale. Execution was also issued by Charles Downing on his judgment; and on these executions, and another execution of S. G. Flagg & Co., of $146.05, the personal property of the company was sold, and the proceeds are now in the hands of the sheriff. On the affidavit of Charles Downing and Edward Downing, a rule was granted by the court to show cause why the judgments of Hopkins, Johnson (trustee), and Sharpless, on which executions had been issued, should not be opened, and the defendant let into a defence; and on the hearing of this rule, the master was appointed to hear the case, and report distribution of the moneys in the hands of the sheriff. After the hearing had proceeded to the completion of the taking of the evidence, a question arose as to the powers of the master. The decree of the court appointing the master had never been certified to him, and was lost or mislaid. Whether it had ever been filed does not appear. The master adjourned the further hearing of the case to allow a motion to be made to the court for a decree. Nothing, however, has been certified to the master, and he will proceed to determine the matter, and make distribution according to his understanding of his powers and duties, as gathered from the conduct of the case before him.

During the progress of the case, a paper, here attached in the handwriting of one of the counsel, was handed to the master. It was not *agreed* that this was a copy of the decree of the court, but, on the contrary, it was alleged that it was not. It embodies, however, substantially what the master conceives to be his duty; to consider the proceeding as in equity, on bill and answer, founded upon · the statement of plaintiff's claims, and affidavits of the Messrs. Downing.

There was much controversy as to the amount due Dr. Hopkins. On a careful examination, the master is satisfied that $3000 represents the amount due him from the company, as nearly as can now be reasonably arrived at.

[Hopkins's and Johnson's Appeal.]

The note to Dr. Hopkins on which suit was brought, was given for $4000, the additional $1000 being compensation as treasurer and secretary. This is objected to, and after examination the master is satisfied it should not be allowed. The affairs of the company, except the furnishing of money, were almost exclusively carried on by the president of the company, who was, so far as its management was concerned, the company, and the services rendered by Dr. Hopkins as secretary and treasurer were comparatively small. It appears that at a meeting of the directors, held May 13th 1875, the salaries of the president and secretary were fixed at $80 per month, dating from February 1st 1874. This, however, was at the end of the year for which the services were charged, and in view of the condition of the company at that time, should not be allowed. The master finds, however, that no fraud was intended in giving the note for $4000, and he therefore finds the amount due to Dr. Hopkins, as already stated, to be $3000, and interest from the corrected date of the note.

The master finds that the moneys paid into the company by William C. Johnson, $3395, were moneys which in fact he held as trustee under a deed of trust from Benjamin Johnson and wife, for their use, which trust was originally created in 1845, by Jane Johnson, grandmother of William C. Johnson. These moneys were first entered on the books of the company as stock, and this was afterwards changed to a loan in the name of William C. Johnson, individually, and afterwards of William C. Johnson, trustee.

The master finds that there is no sum which can be set off against this claim, and that there is owing thereon the sum of $3395, with interest from the corrected date of the note given therefor.

The claim of J. C. Sharpless is correctly represented by the note given him, and which took the place of a former note given for moneys loaned to the company.

The company, in addition to the foregoing, is also considerably indebted to other persons who had dealings with it, as will appear by the schedule hereafter given.

On the foregoing statement of facts, the question arises as to the proper disposition of the money in the hands of the sheriff. It is claimed, on behalf of the first execution-creditors, Dr. E. Hopkins, William C. Johnson, trustee, and J. C. Sharpless, that they are entitled to the money in court, so far as it will extend to pay their respective executions. On the behalf of Charles Downing, a subsequent execution-creditor, it is contended that the first executions should be set aside and the moneys awarded to him. It will be observed that Hopkins, Johnson and Downing were all directors of the company during nearly the whole of the period of its active existence, and that they were all stockholders. In view of the facts that Hopkins and Johnson were officers, the one president, and the other secretary and treasurer, when the suits were brought on the

notes held by them respectively; that service of the writs of summons was made on Hopkins, as secretary and treasurer, and judgment taken by default, and that they were stockholders, the master is of the opinion that they are not entitled to a preference by reason of their executions. Neither is Charles Downing entitled to a preference by reason of his execution. His judgment was entered on a judgment bond given by William C. Johnson, president of the company, without any authority from the board of directors, and not for any debt due or owing to him by the company, but it was a sale by him to the company, of the mortgage he had received from Hopkins, and the bond in question given therefor. The mortgage was, however, afterwards sold by the president of the company for $3400, and the proceeds went to the credit of the company ; and this would create the company a debtor of Charles Downing, independently of the bond. Mr. Downing was also a director during the period when the active operations of the company were carried on, and its debts contracted, and also a stockholder, and stands in the same position, so far as any preference is concerned, as Johnson and Hopkins.

There was no fraud by these parties, and if the executions are to be regarded as giving to those issuing them all the rights of execution-creditors, then, Hopkins and Johnson having issued theirs first in order of time, would be entitled to a preference. The whole proceeding, however, shows a scramble between Hopkins and Johnson, on the one hand, and Downing on the other—all stockholders, and virtually the owners of the company —to obtain a preference over each other in the collection or payment of the amounts due them.

The master is of opinion, under all the circumstances of the case, that the ends of justice will be best subserved, and the manifest duty of the parties to each other, and to the creditors of the company, performed by regarding the process used as a means of disposing of the property, for the benefit of all creditors generally (except as is hereafter mentioned), and the fund thus raised as in, the hands of a receiver for distribution among them.

The master, accordingly, after deducting the expenses of the proceeding, and the executions referred to of Sharpless, and Flagg & Co., which, in the opinion of the master, should be paid in full, and also the amount of rent due Edward Downing, the owner of the real estate on which the operations of the company were carried on, makes distribution of the remainder of the funds among all the creditors of the company, whose claims have been presented, without preference. Interest is counted to the date of the sheriff's sale, to equalize the claims.

The exceptions filed to this report were dismissed, and the report confirmed on March 14th 1878.

On June 24th 1878, the following agreement was filed:

"Whereas, an agreement was made in the above cases under which the matter was proceeded with before J. Smith Futhey, Esq., as master and examiner, which has been lost. Now, it is agreed that an issue be directed to determine how much, if anything, is due said plaintiffs upon their respective judgments aforesaid, and whether the same was obtained in fraud of the creditors of said defendant; and that in lieu of a trial by jury of said issues the same be referred to J. Smith Futhey, Esq., as master and examiner, with like effect as if tried by a jury; and also that he shall make distribution of the moneys made by the sheriff's sale as upon a bill in equity filed by Charles Downing, a creditor of said defendant, against the sheriff and said plaintiffs, charging said plaintiffs with fraud upon said creditor in obtaining said judgments, issuing said executions, and selling the property of said defendant, and withholding the proceeds thereof, in trust for the creditors and stockholders of said defendant, and an answer denying said allegations, and the right of said creditor to file such a bill.

"Either party to have the right to file exceptions to any finding either of law or fact of said master, and the same to be heard and determined as in cases in equity.

"This agreement to take effect as if filed of record prior to the hearing before said examiner, and his report and the exceptions thereto, now on file in said court, to be treated as if made under this agreement."

On August 20th 1878, by an agreement filed, the decree of March 14th 1878, was vacated and the case was subsequently re-argued. On November 1st 1878, the court filed an opinion which set forth that as by the agreement to refer, Downing was the only creditor in the position of a complainant to the supposed bill in equity, the distribution should be made only as between him and the three preceding execution-creditors. The report was therefore referred back to the master for correction.

On November 13th 1878, an amendment to the constructive bill was filed by J. P. Hartman and other creditors, asking to be made parties to said bill, and a rule was granted to show cause why it should not be allowed, which rule was subsequently made absolute. An answer and replication were filed, and the amended bill and answer were again referred to Mr. Futhey, as examiner and master, to report thereon. He afterwards reported upon the whole case, and made a distribution in exact accordance with his first report. Hopkins and Johnson excepted, but the court dismissed their exceptions and confirmed the report. From this decree the exceptants took this appeal, assigning for error:

1. That the court erred in confirming the scheme of distribution amongst all of the creditors; 2. In holding that the amendment to the constructive bill was in time; 3. In holding that any but execution-creditors were entitled to share in the distribution ; 4. In not awarding the fund to the first execution-creditors.

*William E. Barber*, *R. T. Cornwell* and *William Darling-ton*, for appellants.—Directors of a corporation having just and valid claims against it, can sue for and recover them: Brinham *v.* Wellersburg Coal Co., 11 Wright 49; Ashurst's Appeal, 10 P. F. Smith 314; Twinlick Oil Co. *v.* Marbury, 1 Otto 587. The judgments were regular, but if they were not, no one but the corporation could take advantage of such irregularity: Drexel's Appeal, 6 Barr 272; Hauer's Appeal, 5 W. & S. 473; Dickerson's Appeal, 7 Barr 257; Roemer *v.* Denig, 6 Harris 484. These creditors had the right to acquire, by superior diligence, the first lien on the debtor's goods: Siegel *v.* Chidsey, 4 Casey 288. In proceedings to distribute funds raised by a sheriff's sale of personal property, only parties to the record can be heard: Tomb's Appeal, 9 Barr 61; Shutze's Appeal, 1 Id. 251; Schick's Appeal, 13 Wright 380; Schick *v.* Pharo, 13 Id. 384. A judgment of a court of competent jurisdiction cannot be inquired into, except for fraud or collusion: Dougherty's Estate, 9 W. & S. 189; Thompson's Appeal, 7 P. F. Smith 178; Fulton's Estate, 1 Id. 212; Yaple et al. *v.* Titus et al., 5 Wright 202. Where, in a contest between the first and a subsequent execution-creditor on the ground of fraud or collusion, the court decides that the subsequent execution-creditor has no standing, the first execution-creditor is entitled to be first paid out of the fund. Where by such a decision the proceedings have been dismissed, it is not in the power of the general creditors to restore the standing of the subsequent execution-creditor by applying to be made parties to the original bill. A supplemental bill must be strictly in aid of that which the court has already done: 3 Daniel's Ch. 159; Wilson *v.* Todd, 1 Myl. & Cr. 42. An amendment will not be allowed to a bill in equity which makes the case substantially a new one after the case has been argued: Snead *v.* McCoull, 12 Howard 407; Walden *v.* Bodley, 14 Pet. 156; Adam's Eq. 662, n.

*Alfred P. Reid* and *William B. Waddell*, for appellees.—The original bill of Charles Downing charged the appellants "with holding the fund in court in fraud and in trust for all the creditors." By so doing, Downing does not stand in the position of a lien creditor, or claim any benefit by reason of his execution, but as a creditor and stockholder files a bill with allegations that inure to the benefit of all creditors alike. By the amended bill no new cause is raised, for it simply asks that the creditors and stockholders be formally made parties to the suit and have the benefit of the charges therein contained.

There had been no unreasonable delay on their part. Their right had been recognised. They had been actively asserting this right all the time, though not formal parties.

Courts of equity proceed in analogy to the Statute of Limita-

tions, and a constructive trust may be asserted at any time within six years after the knowledge of the facts creating it: Bispham on Equity, p. 260; 2 Story on Equity Jurisprudence, sec. 1520; Ashurst's Appeal, 10 P. F. Smith 290. And where one creditor (under a creditor's bill) files a bill for all, the statute will not run against any of them, but others may come in at any time. No rule of law shall be used for the purpose of protecting fraud: Bispham on Equity, p. 258. No error was therefore committed in permitting the amendment being made.

Again, courts in equity have by statute unlimited power over corporations. Force and effect must be given to the equity branch of the court's power and this court has done so repeatedly: Britton's Appeal, 9 Wright 172; Kohl v. Harting, 8 Watts 328; Tindle's Appeal, 27 P. F. Smith 204; Kelly's Appeal, 4 Harris 59; Merkle's Appeal, Leg. Int. Oct. 6th 1876, p. 358; Selden's Appeal, 24 P. F. Smith 328; Bayard's Appeal, 22 Id. 453. Directors of a corporation occupy a fiduciary relation to it, and they cannot, because they are directors, secure an advantage to themselves not common to other creditors: Drury v. Cross, 7 Wallace 302; Jackson v. Ludeling, 21 Id. 616; Koehler v. Black River Falls Iron Co., 2 Black 716; Cumberland Coal Co. v. Sherman, 30 Barb. 571; Butts v. Wood, 37 N. Y. 319.

Mr. Justice MERCUR delivered the opinion of the court, May 7th 1879.

This contention is for a fund raised by sheriff's sale of personal estate of the Chester Valley Wheel and Axle Company, an insolvent corporation. The appellants and one Sharpless were the sole directors of the company, at the time the judgments were obtained, on which the executions issued. Johnson was also the president, and Hopkins the secretary and treasurer. .The notes on which the judgments were procured were signed and attested by the appellants in their respective official capacity, and given to each of said three directors. The master has found as a fact "that when these notes were given, and proceedings instituted thereon, the company was insolvent. It was embarrassed and unable to continue its operations, unless more capital or other means was secured." The insolvency was manifestly known to the appellants, and the notes given to each of them undoubtedly with a view of giving a preference over other creditors; yet, as they were given for an existing indebtedness, the master found "there was no intention to collude and commit actual fraud;" nevertheless, he was "of the opinion, that the proceedings of Hopkins and Johnson, acting together as before stated, were, under the circumstances and in the insolvent condition of the company, a fraud in law on the other creditors."

The method first commenced, and pursued for sometime, to make distribution, was unusual and very irregular. But defects which

might otherwise have proved fatal to the whole proceeding, were cured by agreement of parties, including the appellants. They agreed that the question, whether their respective judgments were obtained in fraud of the creditors of the company, should be referred to a master and examiner named, with like effect as if tried by a jury, and that he should make distribution of the money as upon a bill in equity, filed by Downing, a creditor of the company, against the appellants, charging them with fraud, and with holding the money in trust for the creditors and stockholders of the company. By this agreement, signed by the appellants and certain creditors of the company, the court acquired jurisdiction of the proceeding. Although irregular in form, the parties agreed to treat it as a bill in equity. The court having entertained it as such, it became subject to amendment, like other bills, so far as to add the names of other creditors, in furtherance of the specific object of the bill. We therefore discover no error in the court having permitted an amendment, adding the names of other creditors; more especially as the claims of those creditors had, apparently without objection, actually been considered by the master. Under all the circumstances, the amendment was in time.

The master reported that the money should be distributed among all the creditors, giving no preference to any of the execution-creditors. The court below confirmed the report, and decreed accordingly.

As a general rule, it may be conceded that between creditors claiming a fund raised by sheriff's sale, only those who are parties to the record, and have a lien on the property, can be heard. In the distribution of the personal estate of an insolvent corporation, a different rule prevails. Prior to the Act of 7th April 1870, Purd. Dig. 291, pl. 52, the remedy to enforce execution against a corporation was by sequestration. That remedy was superseded by this act: Philadelphia and Baltimore Central Railroad Co.'s Appeal, 20 P. F. Smith 355; Bayard's Appeal, 22 Id. 453. Although the act authorized the personal property and franchises of a corporation to be sold on a fieri facias, yet it did not intend that the whole property of an insolvent corporation should be for the sole use and benefit of the plaintiff in the execution. The levy on property of such a corporation does not give a preferred lien on the property thus seized. The proceeds are to be distributed among all the creditors, as in case of insolvency: Id. It follows, therefore, notwithstanding the anomalous proceeding, yet aided by the agreement of the parties, substantial justice has been done, and the decree ought not to be disturbed.

Decree affirmed, and appeal dismissed at the costs of the appellants.