G. A. Mueller, M. D., and Elijah Stewart, Receiver, *v.* The Monongahela Fire Clay Company, J. C. Bovard, Orr B. Bovard, A. V. Parnell and the Lincoln National Bank, Appellants.

*Definition of insolvency.*

Insolvency generally signifies insufficiency of assets when turned into money to discharge existing indebtedness.

*Corporation—Insolvency—Receivers.*

A corporation had assets worth at fair valuation $40,000, and debts amounting to $16,000, with not sufficient ready money to pay its indebtedness. Among the debts were $5,000 which it owed to banks upon notes on which the four directors of the corporation were indorsers. At the request of the banks the corporation confessed a judgment to the four directors in trust for the banks. *Held*, that the facts were not sufficient to sustain a charge that the corporation was insolvent at the time the judgment was confessed.

*Corporations—Directors—Rights of stockholders—Confession of judgment—Preference.*

Where the directors of a corporation are indorsers of its notes, and vote

in favor of confessing a judgment by the corporation, which judgment will relieve them from personal liability, the stockholders have the right to the most exacting inquiry into the nature of the transaction.

Where a corporation borrows money from banks upon notes indorsed by all of its directors, who receive no personal benefit from the transaction, the directors may, subsequently, when the banks refuse to renew the notes and demand a judgment, confess a judgment to themselves as trustees for the banks to secure the payment of the debt.

Argued Oct. 13, 1897. Appeal, No. 113, Oct. T., 1897, by defendants, from decree of C. P. Beaver Co., Sept. T., 1895, No. 5, on bill in equity. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Reversed.

Bill in equity by a stockholder for the appointment of a receiver.

On August 13, 1895, G. A. Mueller, M. D., filed this bill against the defendants. On August 23, 1895, Elijah Stewart was appointed receiver of the Monongahela Fire Clay Co. On October 5, 1896, said receiver was made party plaintiff by the court.

The facts appear by the opinion of the Supreme Court.

The court entered the following decree:

And, now, to wit: June 4, 1897, the judgment at No. 158, September term, 1895, in favor of J. C. Bovard, O. B. Bovard, A. V. Parnell and Benjamin Weaver, for use of the Lincoln National Bank, of Pittsburg, and the First National Bank, of Beaver, is declared null and void as against the creditors of the Monongahela Fire Clay Co., and the lien of the same is directed to be stricken off, and as to all other matters complained of in complainant's bill, the same is dismissed, the costs to be paid by the receiver out of the funds of the defendant company in his hands.

*Error assigned* among others was the decree of the court, quoting it.

*J. F. Reed*, for appellants.

*Alfred P. Marshall*, with him *John M. Buchanan* and *Wm. A. M' Connell*, for appellees, cited Lippincott v. Carriage Co., 25 Fed. Rep. 585.

OPINION BY MR. JUSTICE DEAN, January 3, 1898 :

On the 1st of October, 1891, there was issued to Orr B. Bo-
vard, James C. Bovard, Amsley V. Parnell, R. F. Orr and James
H. Chambers, as incorporators, a charter for the organization of
the Monongahela Fire Clay Co. The purpose of the company was
mining fire clay and coal, and manufacturing fire brick. The
capital stock was fixed at $60,000, which was afterwards re-
duced to $40,000. Before the issue of the letters patent, the
two Bovards, Orr and Parnell were copartners, under the name
of Bovard, Orr & Parnell. They had established a fire brick
manufactory and were carrying it on. The property of the part-
nership consisted of four and a half acres of land in the borough
of Monaca, having thereon erected a fire clay brick factory, out-
buildings, office, boilers and machinery, everything necessary to
the manufacture of brick; adjoining this, they owned about
twenty acres of land underlaid with fire clay. All this prop-
erty was conveyed to the corporation at a valuation of $32,000;
in addition, the corporation agreed to assume the partnership
liabilities then existing, amounting to $9,000, making the actual
cost of the plant $41,000. There was sold cash stock, about
$10,500, payable by instalments ; leaving at most a cash work-
ing capital, after payment of the $9,000 debts of the old part-
nership, only $1,500. On this basis the corporation commenced
business about January 1, 1892, the incorporators being elected
directors. From the confused method of presenting the annual
statements in these paper-books, it is difficult to determine sat-
isfactorily the amount of business done by the company ; the
statements were offered and marked as exhibits, but copies are
not printed, only some of the items from them testified to by
witnesses. We infer, however, from the testimony that the cor-
poration manufactured and sold, including payment of freights,
approximately about $20,000 worth of bricks annually. The
first step taken by the new company was to provide for the debt
assumed ; and it borrowed from Mrs. Orr $5,000, for which was
executed on December 30, 1891, a mortgage ; the money was
applied in part payment of the $9,000 indebtedness ; the com-
pany also, soon after borrowed on its notes for the same purpose
from the Lincoln National Bank of Pittsburg, $4,250 ; there
was also borrowed on note of the company from First National
Bank of Beaver, $750. On all these notes J. C. Bovard, A. V.

Parnell, O. B. Bovard and Benjamin Weaver, directors, became indorsers. These notes were renewed from time to time with the same indorsers down until June, 1895. At a regular monthly meeting of the board held previously, March 9, 1895, a resolution had been adopted authorizing the secretary and treasurer, among other claims, to "make the necessary arrangements with the Lincoln National Bank and the First National Bank of Beaver in regard to the following notes : Notes for $2,000, $1,500 and $750, held by the Lincoln Bank, and $750 held by the First National Bank of Beaver." The banks, soon after, either in June or July following, from the facts of nonpayment for more than three years, and information that another creditor threatened suit, demanded security from the company for their debts, with the statement that if security were not given they would not renew. The directors did not seek the banks to be released from their indorsements, but the banks called upon the officers of the company who were indorsers and demanded security from the company. Notice the testimony of J. C. Bovard : "I was in the West ; I came home ; they told me [at] the Monongahela Fire Clay Co. Mr. McLain wanted to see me ; I went to see Mr. McLain and asked him what he wanted ; he said he wanted those notes better secured, and I asked him what security he wanted, and he said that the only way they could be secured would be for us to take the first judgment, and make a transfer of their interests, it being in two hands, to make a transfer of their interests in the judgment. . . . He said it would be better to put it in one judgment. . . . I made an arrangement right then and there to do that. . . . We called a meeting directly . . . . and gave him judgment as stated on the minutes." The Mr. McLain who represented the bank in this arrangement, and who was president, is not called, but the cashier of the bank is called and testifies to having, in substance, made the same demand of O. B. Bovard, another of the directors, and the bank was notified about the 11th or 12th of July following that a judgment had been confessed against the company to the two Bovards, Parnell and Weaver, as trustees for the two banks, in the sum of $5,000. The cashier's testimony is corroborated by that of O. B. Bovard, who testifies that the judgment was to be taken in the names of the directors, and the Lincoln Bank's interest assigned to it. At a monthly

meeting of the board of directors, on July 10, 1895, by resolution, the board was authorized and directed to execute and deliver to the two Bovards, Parnell and Weaver, the note of the company in the sum of $5,000, at one day after date, with power of attorney to confess judgment to secure their continued indorsements and renewal of the paper of the company. On July 13 following the note was executed and judgment confessed in the common pleas of Beaver county. On April 15, 1896, $4,250 of the judgment was assigned to the Lincoln National Bank, and $750 to the First National Bank of Beaver. The banks continued to renew the notes down to and after this assignment. It is not disputed that the indorsers on the notes were four of the directors who authorized the execution and delivery of the $5,000 note and confession of the judgment.

On August 13, 1895, the plaintiffs filed this bill against the company and the four directors as defendants, averring among other facts and conclusions, that the judgment was without consideration, and given to prefer the directors as creditors, solvency of the company, mismanagement, a purpose to permit the seizure and sale of the corporate property for their individual benefit, concealment of the books and real condition of the company, and praying that a receiver be appointed to manage the property and take possession of its assets; further, that the $5,000 judgment be declared null and void.

To this defendants filed answer, denying mismanagement or intention to have the property sold, and averring that the judgment was lawful and just. Ten days after the filing of the bill the court appointed Elijah Stewart receiver, who duly qualified on his petition, September 16, 1895; an order for sale of the property was awarded by the court, and it was accordingly sold by the receiver for the sum of $5,000, subject to the first mortgage of $5,000 in favor of Mrs. Orr, which sale was confirmed absolutely by the court; July 2, 1896, an auditor was appointed to distribute the balance in hands of the receiver as shown by his accounts filed, but was directed to suspend the audit until final event on the proceeding in equity. On February 13, 1897, the Lincoln National Bank was permitted to intervene as defendant to the extent of its interest in the judgment. After full hearing, the court found as facts:

1. That at the time the judgment note was authorized the company was insolvent, and known to be so by the directors.

2. That the directors authorized the judgment to be confessed to protect themselves as indorsers on the bank paper, thus securing a preference over other creditors.

Therefore the judgment was a fraud in law, and it was declared null and void as against other creditors.

From this decree the defendants appeal, assigning eight errors; all of them, however, in substance denying the correctness of the court's two findings of fact and conclusion of law.

First, as to the finding relating to the insolvency of the company. That the business project at the foot of a lawsuit ended in business disaster may be conceded; but that fact does not establish insolvency prior to that date. When the company was organized it had a property fully worth, from almost undisputed testimony, $32,000; it received cash for stock, $10,500. It then had assets of $42,500, and was in debt the amount of the old partnership liabilities it had assumed, $9,000. It is obvious that a corporation with at most a working capital of $1,500, proposing to do an annual business of $20,000, with monthly payments of at least $1,200, and monthly receipts depending on the quickness of sales and collections, is in financial peril from the start; not necessarily of insolvency, but of inability to carry on business. It may be entirely solvent, in the sense, that its assets far exceed its liabilities, but, that it will be able to promptly pay its debts contracted in the course of business, is exceedingly doubtful. Here the first year's business showed a small profit, the second, third and fourth years considerable loss; these were years of business depression peculiarly trying to enterprises of this kind; such times demanded of the stockholders the utmost harmony of action, that their property might be saved. A prompt ratable contribution of a comparatively small amount of money as working capital would have averted trouble. But instead of harmony, the plaintiffs and other dissatisfied stockholders commenced litigation by averments of record which must necessarily have alarmed creditors and caused public distrust; put their property in the hands of a court official, who with remarkable promptness knocks it down at a sale for a bid less than one fourth of what both sides allege was its market value, and the litigation now proceeds over the right to this fragment.

The finding, that at the date the judgment was authorized the company was insolvent and that the directors knew it, is not warranted by the evidence; on the contrary, is in the face of the evidence. The note with warrant of attorney to confess judgment was given July 10, 1895; more than a month afterwards the plaintiff files his bill, in which he makes affidavit to this averment: "The fair market value of said plant is not less than $40,000, as your orator believes and expects to show." It was proved, by the decided weight of the testimony, that the property was worth what plaintiff averred, and that its entire indebtedness did not exceed $16,000; that is, at the end of nearly four years of most serious depression, a property worth $40,000, doing a comparatively large annual business, has lost $7,000. Clearly, if this is to continue, in three or four years more, the corporation will be insolvent. But if business improve soon, it may pay its debts and earn dividends, or a loan on mortgage may be effected, creating a fixed interest charge, without peril from immediate demand of principal, or the property may be sold by the owners for its "fair market value," $40,000, and $16,000 appropriated to payment of debts, and the balance, $24,000, divided among the stockholders. These directors had no reason to believe the company was insolvent. That they were disappointed in realizing the profits they expected in the beginning, were weary of the labor of managing and carrying on the operations with insufficient working capital, were vexed by the complaints of dissatisfied stockholders, may be conceded; but that they believed the company was insolvent, there is no sufficient evidence.

There is what is called in bankruptcy statutes an act of insolvency which authorizes proceedings to have the debtor declared a bankrupt; such as inability to pay debts contracted in the course of business, as they become due : Buchanan v. Smith, 16 Wall. 308. This may be called statutory insolvency, and may occur where the assets of the debtor largely exceed his obligations; in such case, a large estate may be turned over to the debtor after the law has discharged every liability. But insolvency generally signifies insufficiency of assets when turned into money to discharge existing indebtedness. In Bowersox's Appeal, 100 Pa. 434, we held, that insolvency such as disqualified an administratrix from taking out letters on the estate of·

her deceased husband, was the owing of debts in excess of the value of her tangible property. And this is the commonly accepted meaning of the word. In this sense the company was far from insolvency when the judgment was authorized. We do not consider the fact that the property sold for only $10,000 as important. It is very improbable that a property, no matter how valuable, when decried by some of its owners on the public records as unprofitable and as having sunk large sums of money during three years of its operations, will be considered a very valuable property by bidders. The significant facts here tending to establish solvency at the date the judgment was given are, that the debts were little more than one third the market value; that afterwards, this complaining stockholder averred in his bill that it was entirely solvent, and then called witnesses who proved it. In the preliminary hearing asking for the appointment of a receiver, the court ostensibly appointed one to save the property from insolvency through mismanagement of its officers. It by this appointment found the averments of solvency and mismanagement at that date to be true. This was in effect, an adjudication of solvency after the date of the judgment note.

Neither, does the evidence warrant the second finding, that the judgment was intended as a preference to the officers themselves, and was therefore a fraud in law. The evidence of the two Bovards and the cashier of the bank conclusively shows it was given to secure the banks, because demanded by them. The directors had been indorsers of these notes for three years, the money had been loaned the company, not by the directors, but by the banks, and the lender was now exacting further security from the company, the borrower; and the implied threat was, not only would they refuse to renew but would proceed to obtain judgment against the company unless security was given; coupled with the express promise however that they would continue to renew the paper if their demand was complied with. If the object of the indorsers was to prefer themselves as against other creditors, how could this have been best effected? Certainly by permitting the banks to obtain judgment by adverse proceedings against the company; there was but one lien then, the mortgage of Mrs. Orr for $5,000, and it was clear that the property would sell for at least $10,000; but this would have been

disastrous to the company, for it would have resulted in a seizure and sale by the sheriff; so they concurred in the proposition of the banks to confess a judgment as an additional security, the banks agreeing to continue a renewal of the notes, which was equivalent to an indefinite stay of execution on the judgment. This was, undoubtedly, for the benefit of the company; if the indorsers had been strangers to the company, protection of their interests would have prompted the first course; but as they were stockholders and officers of the company, protection of the company prompted the second course. The general rule on which the court below founded its decree declaring the judgment constructively fraudulent and void, is stated in Morawetz on Corporations, sec. 787. "Directors of an insolvent corporation, who have claims against the company as creditors, must share ratably with other creditors in the distribution of the company's assets. They cannot secure to themselves any advantage or preference over other creditors by using their power as directors for that purpose. Their powers are held by them in trust for all the creditors and cannot be used for their own benefit." This rule is sound, and we have applied it in many cases, notably in the late ones of Rice's Appeal, 79 Pa. 168, Hopkins & Johnson's Appeal, 90 Pa. 69, and Kersteter's Appeal, 149 Pa. 148. But cases often arise which are palpably exceptions to the rule, because not within its reason, and where if the rule were enforced gross injustice would result. It is the settled law of this commonwealth, that an insolvent debtor, whether corporation or individual, may prefer bona fide creditors; but if the creditor benefited be a director or other officer possessed of corporate power and corporate knowledge of the insolvency of his corporation, then he has an advantage over other creditors whose claims may be of equal merit; he has knowledge that his debt is in peril, and has the power to prefer himself. As he is in a sense trustee for all the stockholders and creditors, equity forbids that he should act solely for himself, regardless of the interests of those for whom he is trustee; and in case he prefers his own debt, the burden is on him to show circumstances which raise an equity in his favor, and which take the particular case out of the operation of the general rule. An examination of our own cases from Gordon *v.* Preston, 1 W. 385, decided in 1833, indicates with sufficient

clearness the nature of the circumstances sufficient to create
the exception. In this case a director and creditor took a mort-
gage on the corporate property for an actual debt owing him,
and the mortgage was put of record. The corporation stock-
holders and creditors remained silent for more than eight
months, and until by subsequent debts the company became
insolvent; then a junior judgment creditor instituted proceed-
ings to have the mortgage declared invalid, among other rea-
sons, because proper notice of the board meeting had not been
given, and further because the mortgagees were the president
and treasurer of the company when the mortgage was author-
ized and executed. This court, in an opinion by GIBSON, C. J.,
held that "To disaffirm it now when every opportunity of ob-
taining any other security is lost would be unconscionable;"
and further: "That a corporator may sustain the relation of
debtor or creditor in regard to the corporation, and in the latter
receive a security, is a proposition which requires not the aid of
an argument, and here the existence of a meritorious debt is
not disputed."

Ashhurst's Appeal 60, Pa. 290, was a bill in equity between
warring stockholders, heard before STRONG, J., at nisi prius, and
his opinion and conclusions of law affirmed by this Court, per
curiam, on appeal. The company owned a very valuable prop-
erty, but was largely in debt, and its property, real and personal,
on the verge of seizure by the sheriff; a meeting of the stock-
holders authorized the directors to sell the property; the direc-
tors sold to themselves and paid a large sum; everything was
fair and open, and the transaction was for the best interests of
creditors and stockholders. The sale was held valid, Justice
STRONG in his opinion saying: "There must be many things
which directors can do for their individual benefit which are
binding on a corporation of which they are directors. If they
have advanced money I cannot doubt they may pay themselves
with corporate funds. If they have become liable as sureties
for the corporation, they may provide for their indemnity. And
although, ordinarily, the law frowns upon contracts made by
them in their representative character, with themselves as pri-
vate persons, such contracts are not necessarily void. They are
carefully watched, and their fairness must be shown."

In Neal's Appeal, 129 Pa. 64, this court decided: "Where

the judgment bond of a corporation is given to certain of its directors as a security to protect them on their indorsement for the company, and it is not made to appear that the company was insolvent at the time, or that at the time there was any collusion or actual fraudulent intent, the entry of the judgment on the bond, after insolvency, will not warrant an injunction to restrain the sale of the corporate property." It will be noticed, in this case, the bond was given at a time when the company was not insolvent, but was used, that is, was entered of record, by the directors after they had knowledge of the insolvency.

In case of Oil Co. v. Marbury, 1 Otto, 587, the Supreme Court of the United States fully considers the application of the rule and holds thus : "While it is true that the defendant as a director of the corporation was bound by all those rules of conscientious fairness which courts of equity have imposed as the guards of dealing in such cases, it cannot be maintained that any rule forbids one director among several from loaning money to the corporation when the money is needed, and the transaction is open and otherwise free from blame. No adjudged case has gone so far as this. Such a doctrine, while it would afford little protection to the corporation against actual fraud or oppression, would deprive it of the aid of those most interested in giving it aid judiciously, and best qualified to judge of the necessity of that aid, and the extent to which it may safely be given." And the conclusion of the court, after discussing the theory on which the rule rests, that is, that the directors are trustees, comes to the conclusion that : "When the lender is a director charged with others with the control and management of the corporation, representing in this regard the aggregated interests of all the stockholders, his obligation, if he becomes a party to a contract with the company, to candor and fair dealing is increased in the precise degree that his representative character has given him power and control." That is, if the favored director was but one out of a board of seven or nine, his power to prefer himself would be minimized, and the transaction would not be so rigidly scrutinized as if he were one of a board of three.

In the case in hand, the number of directors was four, all of whom were indorsers on the notes held by the bank; they voted unanimously to authorize the judgment; having thus the maximum of power, the other stockholders have the right to the most

exacting inquiry into the nature of the transaction. That we think has been had. It conclusively establishes that part of the purchase money of the corporate property was $9,000 of debts which the company assumed, then due and payable ; money was borrowed on the notes of the company with the four directors as indorsers, and applied in part payment of this debt. This was in direct aid of the corporation, at the very commencement of its business; the directors received not a cent of compensation for assuming a liability for the benefit of all the stockholders, or for continuing that liability when the banks demanded better security from the company. The debt ought to have been paid four years before; when demanded the company was compelled to borrow the money somewhere; if, instead of $5,000, it had borrowed from Mrs. Orr $10,000, and had given her a mortgage for the last amount, the validity of it would not have been disputed any more than is her $5,000 mortgage; both amounts were applied towards payment of the debt assumed ; how does it impair the validity of the transaction that $5,000 was shifted from the original creditors to the bank? Why should the legality of the bank's security be affected by the fact, that incidentally the indorsers were relieved from a liability which they had assumed for the benefit of the company? The result of the contention of the appellees is that the judgment should be vacated and the banks be turned over to suit against the indorsers, and that the indorsers should be compelled to contribute to other stockholders and creditors for the privilege of loaning their credit to the company, $5,000. There never was a time that the rule heretofore stated would have been permitted to work such injustice. But even if there had been, we think we have shown that in later years the rule has been relaxed so as to accord with the growing necessities of the business world. Where one manufacturing corporation existed fifty years ago there are now thousands. To hold, that it shall be a constructive fraud for the officers of such corporations to aid them with money or credit, in a business exigency, without indemnity, as is said in Oil Co. v. Marbury, supra, is to deprive them of the aid of those most interested in their success, and who are best qualified to judge of the necessity of that aid.

The true interpretation of the rule, as shown by our own cases and the weight of authority in the United States, is, that the

burden is on the officers having both the power and preference to show that the contract was fair under all the circumstances, as in Ashhurst's Appeal, supra, and other cases cited; and that even if the judgment was entered after insolvency was known, yet the contract having been made before insolvency, as an indemnity to the directors for individual indorsements, such judgment could be enforced as a lien against the corporate property, as in Neal's Appeal, supra.

We are of the opinion, first, that the finding of fact in the court below that the company was insolvent at the date the judgment was authorized is manifest error, because not in accord with the undisputed evidence. Second, that even if the company was insolvent, and the directors knew it, at the date the judgment was given, under the facts proved, the conclusion that the judgment was therefore fraudulent and void is erroneous, because not in accord with the settled law.

The decree is reversed at the costs of the appellees, and it is directed that the balance in the hands of the receiver be distributed by the auditor in accordance with this opinion.