### McCLEAN v. BRADLEY et al.

### GARDINER et al. v. SAME.

(Circuit Court of Appeals, Sixth Circuit.   June 12, 1924.)

Nos. 3905, 3906.

1. **Corporations ⊛316(1)—Director may make valid loan to corporation.**
   A director is not prohibited from lending money to his corporation when needed for its benefit, and the transaction is open and otherwise free from blame.

2. **Corporations ⊛316(1)—Mortgage to directors held voidable only by prompt action of stockholders.**
   Where a corporation organized to manufacture a patented gun was practically insolvent, and all its property was mortgaged, a second mortgage, taken by directors on its patents, to secure money advanced to pay the expense of a naval test of the gun, on which the success of the enterprise depended, was not void, but at most voidable only by prompt action by the stockholders.

3. **Corporations ⊛198—In the absence of fraud, a vote by proxy is binding on the stockholder.**
   A vote by proxy in ratification of a mortgage to directors is as binding on the stockholder as his own vote, unless it is shown that the vote was cast in furtherance of a fraudulent conspiracy or collusion between the person holding the proxy and the interested directors.

4. **Corporations ⊛481—Sale of property under a chattel mortgage held valid.**
   A sale of patents owned by a corporation, and then having no commercial value, under a second mortgage, of which sale the stockholders were each notified by mail, held valid, where the price paid was adequate under the circumstances.

5. **Corporations ⊛312(5)—In absence of fraud, directors may buy property of corporation at public sale.**
   Directors have the right to buy property of the corporation at a public sale, if no fraud intervenes, and the transaction was open and fair, and the stockholders had notice of the sale.

⊛For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**6, Corporations ⬥⟹320(3), 574—Right of stockholders to attack validity of reorganization, and of mortgages given by reorganized corporation, held barred by laches.**

The right of stockholders to attack the validity of a reorganization, and of mortgages given by the reorganized company, 10 years after the transactions, of which they had knowledge, *held* barred by laches.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Ohio; John W. Peck, Judge.

Consolidated suits in equity by Samuel N. McClean and by F. A. Gardiner and others against M. A. Bradley and others. Decrees for defendants, and complainants appeal. Affirmed.

For opinion below, see 282 Fed. 1011.

Arthur P. Greeley, of Washington, D. C., Erwin G. Guthery, of Cleveland, Ohio (Elijah N. Zoline, of New York City, Gilbert H. Baker, of Penn Yan, N. Y., and James Hamilton Lewis, of Chicago, Ill., on the brief), for appellants.

S. H. Tolles, W. B. Cockley, and John F. Wilson, all of Cleveland, Ohio (A. A. Stearns and J. G. Fogg, both of Cleveland, Ohio, on the brief), for appellees.

Before DENISON, MACK, and DONAHUE, Circuit Judges.

DONAHUE, Circuit Judge. On March 3, 1920, Hubert H. Ward filed his bill of complaint against Robert M. Calfee and others, which action was numbered 531 on the equity docket of the District Court. On October 13, 1920, Samuel N. McClean filed a bill of complaint against M. A. Bradley, R. M. Calfee, the Guardian Savings & Trust Company, trustee of the estate of John G. W. Cowles (No. 581), and on the same day F. A. Gardiner and others filed their bill of complaint against the same defendants and others (No. 582). It appearing that these separate actions involved the same transactions and substantially a common cause of action, the court, with consent of counsel, entered an order consolidating causes Nos. 581 and 582 with cause No. 531, and that the consolidated case proceed under the title of Ward v. Calfee et al., No. 531. Later, upon motion of Ward, the original action, No. 531, was dismissed without prejudice, and causes Nos. 581 and 582 proceeded to final hearing and decree upon the original order of consolidation. The defendants actually served with summons are Bradley, Calfee, and the Guardian Savings & Trust Company, trustee of the Cowles estate.

It is alleged in both complaints that in 1908 Bradley, Babcock, Cowles, and Brown, who were then directors of the McClean Arms & Ordnance Company, the defendant Calfee, and Isaac N. Lewis, an ordnance officer of the United States Army, entered into a fraudulent conspiracy for the purpose of defrauding the McClean Company out of the patents owned by it and appropriating these patents to their own use; that in furtherance of this conspiracy Bradley, Babcock, Cowles, and Brown loaned to the McClean Company about $40,000 in money and caused a mortgage of these patents to be executed to themselves to secure the repayment of this loan, and later purchased these at a

⬥⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

sale made under the terms and provisions of this chattel mortgage, and converted the same to their own use and profit, without the consent of the plaintiffs, who were minority stockholders. The complainants in both actions seek to have the sale of these patents to Brown, Babcock, Bradley, and Cowles, under this chattel mortgage, set aside and held for naught, and an accounting of profits derived therefrom. McClean also asks in his bill of complaint that these defendants be required to turn over to him 20 per cent. of the stock of the Automatic Arms Company, in accordance with the terms of a certain contract in writing which he made with them on the 6th day of January, 1908, and for an accounting of dividends paid thereon.

The defendants interposed a motion to dismiss these actions, for the reason that the McClean Arms & Ordnance Company was not made a party to either suit, which motion was overruled by the District Court, and exceptions noted. The Guardian Savings & Trust Company, trustee of the estate of John G. W. Cowles, deceased, also moved to dismiss as to it upon the further grounds that this action was barred by the statute of limitation of California against the estate of John G. W. Cowles, who was a resident of California and domiciled in that state at the time of his death. This motion was also overruled, and exceptions taken. The defendants by separate answers denied all allegations of fraud and misconduct on their part, and averred laches on the part of complainants. Upon the hearing of the cause the District Court entered a decree dismissing the bills of complaint, from which decree the plaintiffs have appealed. The Guardian Savings & Trust Company has also taken a cross-appeal from the decree of the District Court overruling its motion to dismiss.

The facts upon which plaintiffs rely for recovery are fully stated by the District Court in its opinion published in 282 Fed. 1011. It is therefore unnecessary for this court to restate these facts in detail. It is claimed, however, that the trial court erred in several particulars as to the facts admitted or proven, but for the purposes of this case it may be conceded that the statement of facts made by the trial court, as appears in its published opinion, are erroneous in the particulars and to the extent claimed by appellants, nevertheless, for the reasons hereinafter stated, the same result must follow.

Some question is made in the briefs as to the burden of proof. That question becomes wholly immaterial, for the reason that it conclusively appears from the evidence, that will later be discussed in connection with the validity of the chattel mortgage, that these defendants did not enter into any fraudulent conspiracy as charged in the complaints, for the purpose of defrauding the McClean Company and appropriating any part of its property to their own use, or for any other unlawful or fraudulent purpose, nor were the directors of this corporation guilty of any actual fraud in the management and control of the McClean Company's business and property.

It is claimed upon the part of the appellees that the complainants, having specifically charged these defendants with actual fraud and conspiracy to defraud as grounds of recovery, cannot now recover upon any other theory. The allegations of these complaints, however, are

broad enough to include constructive fraud, and also to present the question of the validity of the chattel mortgage to these directors, and the validity of the sale of the patents under the terms and provisions of that mortgage.

While there is some conflict in the evidence, there is no substantial dispute as to the material facts, but rather as to the law and the principles of equity applicable to these facts. When Bradley, Babcock, Cowles, Brown, Calfee, and Ward were elected directors, the McClean Company was on the verge of financial ruin. That company and its predecessor, an Iowa corporation of the same name and organized for the same purpose, had expended, without success, approximately $400,-000 to exploit the McClean patents. It was largely indebted to divers creditors, who were pressing for immediate payment. Its funds were exhausted, and its property, including the patents, was all mortgaged to secure the payment of its debt to the State Banking & Trust Company of Cleveland, Ohio. That company had taken possession under its mortgage of all the company's property, including machine shop and tools, and was proceeding to sell the same for the satisfaction of this debt. Notwithstanding the then serious situation of the company's financial affairs, and the large sum of money already expended without satisfactory results, the stockholders and these directors evidently still believed that the McClean patents were valuable. Acting upon that belief, the directors, Bradley, Babcock, Cowles, and Brown, contributed $40,000 of the $54,000 raised by the reorganization committee. The State Banking & Trust Company of Cleveland was induced to extend time of payment of the debt due to it and the other debts were compromised and adjusted.

When the funds raised by the reorganization committee were exhausted, the defendants Bradley, Babcock, Cowles, and Brown loaned to the company from time to time $36,600. There is absolutely no evidence in this record tending to show that the funds raised by this reorganization committee, or the moneys loaned to the company by these directors were not expended for the legitimate purposes of the corporation, or that these loans were made to the company by these directors in furtherance of a conspiracy to defraud the McClean Company by appropriating to themselves the McClean patents. When the gun or guns constructed in accordance with the teaching of these patents twice failed to meet the required test, and when the Navy Department of the United States consented to make another test, these directors loaned to the company the further sum of $4,000 to finance preparations for a third and final test. So far as appears by this record, these separate loans were made in good faith. The money loaned to the corporation by these directors was absolutely necessary for its purposes, and was expended for its benefit. These directors were taking all the chances of failure. They were loaning their money to a corporation which was then practically insolvent, and could not possibly repay the same, unless the McClean gun should meet the required test. If it did meet the test, the directors could not possibly derive any profit therefrom, in which the other stockholders would not share in proportion to the stock held by each.

[1] A director is not prohibited from lending money to his corporation, when it is needed for its benefit, and the transaction is open and otherwise free from blame. Twin-Lick Oil Co. v. Marbury, 91 U. S. 587, 23 L. Ed. 328; Gould v. Railway Company (C. C.) 52 Fed. 680, 685; In re Eastman Oil Co. (D. C.) 238 Fed. 416, and cases there cited; McKey v. Bruns, 243 Fed. 370, 156 C. C. A. 150. McClean continued in the employ of this company after its reorganization until final test and failure of the McClean gun. He must have known, or at least he had the means of knowing, the financial situation of this company, and the supreme effort these directors were making, without any aid from other stockholders, to accomplish commercial success. The other stockholders may or may not have known the exact financial situation at the time these moneys were loaned by the directors, but they were fully advised before the sale of the company's patents for the payment of these debts.

[2] In view of the fact that the McClean gun had failed in two earlier tests, it was not unreasonable, unfair, or fraudulent for these directors to insist upon a chattel mortgage covering the McClean Company's equity in these patents, when they loaned to that company the last $4,000. These patents were already under mortgage to the State Banking & Trust Company. A second mortgage afforded very little security for the repayment of these loans, but it was all the security that the company could offer, and the money was imperatively required to make preparations for the final test. Nor did this chattel mortgage prejudice the right of general creditors. The general creditors were all paid out of funds loaned by these directors after the company discontinued business. No creditors are here complaining. For this reason the authorities cited by counsel, where rights of creditors were involved, have no application to this case.

Nor did this chattel mortgage prejudice the rights of the McClean Company. The debt was an honest one. The corporation could not avoid the application of its property to the payment of its debts. A sale of these patents was inevitable, and it made little difference to the corporation and its stockholders whether they were sold under the mortgage of the State Banking & Trust Company, the second mortgage held by these directors, or upon execution; the result to the corporation would be the same. Nor did this mortgage cover the entire property owned by the company, as did the mortgage of the State Banking & Trust Company. It was not a sale of all the company's property, nor was it the cause of putting the McClean Company out of business. On the contrary, the McClean Company was out of business long before there was any sale of these patents. The stockholders must have known this, or at least they had reason to believe that it could function no longer after the seizure and sale of its machine shop and tools by the State Banking & Trust Company, and the attempt by that company to sell these patents under its prior mortgage. Under the facts and circumstances of this case, this mortgage was not void, but at most voidable only on prompt action by the stockholders. Twin Oil Co. v. Marbury, supra; Geddes et al. v. Anaconda Copper Mine Co., 254 U. S. 590, 41 Sup. Ct. 209, 65 L. Ed. 425; Gould v. Railway Co., supra;

Westerlund v. Mining Co., 203 Fed. 599, 612, 121 C. C. A. 627, and cases there cited.

[3] Shortly thereafter, and on January 17, 1910, at the annual meeting of the stockholders, the execution of this chattel mortgage was ratified by the stockholders without a dissenting vote. It is said, however, that there was no stockholder other than Gardiner present in person at this annual meeting, and that all the other stockholders, except McClean, were represented by proxies. This was the annual meeting; the person or persons holding proxies of stockholders had the right and authority to vote upon any matter that might properly come before that meeting that the stockholder could have voted upon, if personally present. Cook on Corporations, §§ 595, 610.

A vote by proxy is as binding upon the stockholder as his own vote, unless it be shown that such vote was cast in furtherance of a fraudulent conspiracy or collusion between the person holding the proxy and the interested directors. Columbia National Bank v. Mathews, 85 Fed. 934, 941, 29 C. C. A. 491. There is absolutely no direct proof of any such fraud or collusion, nor do the facts established by the evidence justify any such inference. The great majority of the stockholders whose votes were so cast have not attempted to repudiate the authority of their proxies. Gardiner, one of the appellants, was present and apparently took an active part in the proceedings. He also voted to ratify this chattel mortgage. Even if it were assumed that the stockholders other than Gardiner, who are parties to this action, are not bound by the vote of their proxies, nevertheless there would still be sufficient votes at this annual meeting to ratify this chattel mortgage.

It would be wholly unfair and inequitable to permit a stockholder, at this late date, to repudiate the vote cast by his proxy, selected by himself and authorized in writing to represent him at this annual meeting. If the stockholder was not then advised as to what transpired at this meeting, he could, if interested, have secured information by requesting his proxy to report to him. It is altogether possible, however, that the stockholders were not very much interested in what transpired at this meeting. Their attitude is probably fairly reflected by the letter of Gerstenberger to Calfee, written from Bayonne, N. J., on January 15, 1910, in which he says, among other things, that the sale of the company's property "is likely to destroy all chances of further efforts on the part of the company. It would be useless for me to go to the meeting. Pretty sad for a lot of us." This stockholder was only a few miles from Jersey City, in which this annual meeting was held.

If, however, the stockholders had been fully advised in reference to all that had transpired at this annual meeting, or had been present in person, they could not, consistently with honesty and fair dealing, have repudiated a mortgage given to secure money loaned to the corporation and expended for the common good of all stockholders. A refusal to ratify the mortgage at that time would have been to no purpose. These directors were then in position to subject the property of this corporation to the payment of its debts, with or without a mortgage. Geddes v. Anaconda Mining Co., supra.

[4] It is claimed, however, that the sale of this patent property was invalid for lack of notice. This sale was not advertised in the news-

papers, but the evidence establishes the fact that on April 27th the secretary of the corporation sent to each stockholder a notice of the sale of these patents to be held on May 13th. Notices were also posted at the old and the new courthouse in Cleveland. The bank holding the prior mortgage was also notified, and copies of the notice of sale were sent to the manufacturers of arms, who were the only ones likely to be interested in purchasing the same.

The conduct of these directors must be judged by existing facts at the time these transactions occurred, and not in the light of subsequent developments. At that time practically $500,000 had been expended to exploit the McClean patents. The result was a complete and absolute failure. The McClean Company was without money and without credit. It was then indebted in the sum of approximately $100,000. It had executed a first mortgage on all of its property to the State Banking & Trust Company to secure the payment of practically half that amount. Long before this, the bank had become dissatisfied with this security, and demanded as a condition precedent to the extension of time of payment that these four directors should personally indorse one of the company's notes in excess of $4,000. After the third and final failure of the McClean gun, the bank refused further to extend time of payment, and took possession under its chattel mortgage of the company's machine shop and tools, and sold the same for $16,000. It also made an effort to sell the McClean patents, which were also covered by its mortgage, and received but one bid, of $200 only. There were also current debts amounting to $3,300, which these directors advanced the money to pay after the third test had resulted in failure.

If these defendants had sought by fraudulent means and unfair methods to get possession and control of these patents, it was not necessary for them to obtain a second mortgage to themselves, or to buy when offered for sale under this second mortgage. They could have bought them for a trifling sum, when offered for sale under the State Banking & Trust Company mortgage; but evidently they then considered them practically valueless, and for that reason were unwilling to pay even a small sum of money to release them from the lien of this first mortgage.

No claim is made that the stockholders did not have full notice of the efforts made by the State Banking & Trust Company to sell these patents, and yet, with full knowledge and notice of the crisis reached in the affairs of this company, they refused, or at least neglected, to contribute a single dollar to save the McClean machine shop and patents from sale under the bank's mortgage, or to repay any of the money loaned to the company by these directors. The sole complaint now is that these patents were not sold under the first, but under the second, mortgage, and that the complainants have but recently discovered that fact.

[5] These directors had the right to purchase this property at public sale, if no fraud intervened, and the transaction was open and fair, and the stockholders had notice of such sale. Twin-Lick Oil Co. v. Marbury, supra; McKittrick v. Railway Company, 152 U. S. 473, 497,

299 F.—25

14 Sup. Ct. 661, 38 L. Ed. 518; Ashurst's Appeal, 60 Pa. 290, 313; Mueller v. Fire Clay Co., 183 Pa. 450, 459, 38 Atl. 1009.

Upon the question of the inadequacy of price it must be remembered that the sale of these patents exhausted the company's ability to pay, and, so far as the company or its stockholders are concerned, it made no difference whether they were sold for $1,000 or for $50,000, for that is all these directors will ever receive from this company upon the debt due them. The sale was also made subject to the prior lien of the first mortgage, which, after crediting the proceeds of the sale of the machine shop thereon, would still be in the neighborhood of $25,-000. While these patents may have had inherent merit, it is beyond question that at the time of this sale they had no market or commercial value, and the only possibility of their being made valuable was by the expenditure of further sums of money. The McClean Company had no money, and its stockholders refused to contribute further to the enormous sums already expended in useless effort. As further indicated the commercial value of these patents, the State Banking & Trust Company released their prior mortgage several months thereafter at a loss to it of about $4,000.

[6] For the reasons stated, this court has reached the conclusion that this chattel mortgage was not void, but voidable only; that it was ratified by the stockholders at their next annual meeting, held shortly after it was given; and that the sale was fairly made and for an adequate consideration. It further appears from the evidence that, after these directors had expended a substantial sum of money in financing the Lewis experiments, and after the Automatic Arms Company had been organized, a letter was sent out to each of the stockholders of the old McClean Company, offering them an opportunity to come into that company upon equal terms with these directors, but with the further provision that they should contribute the further sums necessary in proportion to the stock held by each to complete the experiments already begun. The experience these directors had with the stockholders of the McClean Company, when they wholly failed and refused to contribute any further funds when the crisis in the affairs of that company had been reached, fully justified this provision, which, of course, would have been equally binding upon these defendants as upon the stockholders who might accept the proposition. This they refused to do, but are now demanding a share of the profits.

For substantially the same reasons above stated the prayer in the McClean complaint that he be awarded 20 per cent. of the stock in the Automatic Arms Company and an accounting of profits must be denied. It is perhaps true that early in January of 1908, when McClean entered into a contract with these defendants for the surrender of his stock, the organization of a new company to take over the property and business of the McClean Company was contemplated. However that may be the plan finally adopted was a reorganization of the old company. All of the stockholders, including McClean, knew that this plan of reorganization had been finally adopted and was being put into force and effect by the reorganization committee. Whether or not there was any discrimination in the reissue of the surrendered stock is not

now important. If there was, the evidence is convincing that these defendants did not know anything about it. That McClean knew that no new company was to be formed, and that he also knew the exact financial condition of the old company at that time, fully appears by his letter to Van Kirk, dated February 19, 1908, which letter was offered and admitted in evidence:

He also accepted the return to him of 3,000 shares of the stock in the reorganized company, which was more than his fair proportion, in view of the fact that the other stockholders had surrendered 75 per cent. of their original holdings. McClean must be held to have consented to this change in the original plan and to the acceptance of 3,000 shares of stock in the reorganized company, instead of 20 per cent. of the stock of a proposed new company, as his original contract contemplated. The averment that these directors fraudulently permitted the state of New Jersey to forfeit the company's charter for nonpayment of the franchise tax, when they had money in the treasury with which to pay these taxes, is not sustained by any evidence. On the contrary, the evidence is uncontradicted that this company was borrowing money from and after April, 1909, until the end of its activities in order to carry on its experimental work.

Wholly aside from the merits of the questions above discussed, these complainants have been guilty of such laches that a court of equity ought not to grant them any relief. The claim upon behalf of complainants that they had no knowledge nor means of knowledge in reference to the transactions now complained of is not sustained by the evidence. If these stockholders had given any attention whatever to the affairs of the McClean Company, they must have known that the McClean Company made a determined and desperate effort, and exhausted all its resources and all its credit in an unsuccessful effort to develop and adapt the McClean and other patents to commercial use, and, failing in that, it died a natural death.

There is some conflict in the testimony of Calfee and McClean as to whether McClean was advised of the exact situation after the company discontinued business. In view of the fact that McClean continued with this company until it ceased to operate, the evidence warrants the finding that he knew the McClean Company machine shop had been seized and sold under the prior mortgage of the State Banking & Trust Company, and that company was endeavoring to sell these patents, but was unable to do so, because no bidders could be obtained that would pay in excess of $200 therefor. He must also have known that this company was unable to continue business after seizure and sale of its machine shop, and that its property must be subjected to the payment of its debts. Some complaint is made that these directors did not go forward as trustee of this defunct corporation and wind up its affairs in accordance with the New Jersey statute. That is substantially what was done, and the method by which this was accomplished was of little or no importance to the stockholders, unless it is made to appear by the evidence that by reason of fraudulent conduct on the part of the directors, not only that this property did not sell for its fair value in money at that time, but also that it was then worth and would

have sold for a sum substantially larger than the debts owing by the corporation. The evidence is wholly to the contrary.

A number of other questions have been discussed in the briefs of counsel, but it is unnecessary to discuss them in this opinion. The facts stated are the controlling facts in this case. It is also unnecessary to determine the question presented by the cross-appeal, or the right of the Guardian Savings & Trust Company to prosecute a cross-appeal to a decree of the court overruling its motion to dismiss the complaints, when the same decree was entered by the court for reasons other than the reasons presented in the motion.

The judgment of the District Court is affirmed.