**GOLDBOSS v. REIMANN et al.**

District Court, S. D. New York.
Aug. 4, 1943.

Sabath, Perlman, Goodman & Rein of Chicago, Ill., and Samuel L. Chess, of New York City (Samuel L. Chess, of New York City, Theodore E. Rein, of Chicago, Ill., and Murray Ratner, of New York City, of counsel), for plaintiff.

Root, Clark, Buckner & Ballantine, of New York City (Arthur A. Ballantine, of New York City, of counsel), for defendants Lawrence W. Schmidt and others.

Parker & Duryee, of New York City, for defendant Quarterly Income Shares, Inc.

BRIGHT, District Judge.

The defendants Lawrence W. Schmidt, Bernard E. Lawson, Ross Beason, Maryland Sponsers, Inc., Administrative and Research Corporation (New York) and American Depositor Corporation who, with the defendant Quarterly Income Shares, Inc., are the only defendants served with process or who have voluntarily appeared herein, move under Rule 56(b) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, for summary judgment in their favor, alleging that there is no genuine issue as to any material fact, that the second amended complaint fails to state a claim upon which relief can be granted, that the stockholders of Quarterly Income Shares, Inc. (for whose benefit this action is purportedly brought) ratified the contracts which it is alleged were improperly entered into, that plaintiff by reason of her ratification is estopped from maintaining this action, and that the six year statute of limitations is a complete bar. Plaintiff in a separate motion seeks under Rule 34 a discovery and inspection, and under Rule 30 for an examination of the defendants.

A motion for summary judgment, before issue joined, was made by the same defendants in January 1942. Plaintiff then requested a continuance of that motion in order to permit her, pursuant to Rule 56(f), to take the testimony of defendants or others to present facts to justify her position and to oppose defendants' motion. An order was then made, striking out portions of the amended complaint, denying defendants' motion for summary judgment without prejudice to a renewal thereof after issue joined and after plaintiff had had a fair opportunity to take depositions and make discovery; but it was provided that.

such procedure must be promptly and diligently conducted by her. 44 F.Supp. 756.

After the entry of that order, a second amended complaint was filed on March 20, 1942 and the answer thereto of the moving defendants was filed on April 13, 1942. On May 9, 1942, a stipulation was entered into between the parties under which defendants agreed to produce and permit plaintiff to inspect and copy all books, records, financial statements, etc. which might be called for by plaintiff, insofar as they were in the possession or control of the respective defendants and represented evidence material to any matter involved in the action and were not privileged; and if at any time during the discovery it appeared that it could not proceed pursuant to the agreement, the stipulation would not prejudice and the rights of either party would be determined as if no stipulation had been entered into. The defendants' motion now before the court was noticed for October 27, 1942, and the plaintiff's for March 19, 1943.

The action is a derivative one, brought by a stockholder, owning thirty shares of common stock of the defendant Quarterly Income Shares, Inc., acquired on January 16, 1934, on behalf of herself and all other owners and holders of such stock, similarly situated. The relief demanded is, (1) that defendants account for all their acts and doings in relation to that corporation, and particularly with reference to all financial matters appertaining thereto, including all fees, salaries, commissions and other compensation, received by them or derived from the sale, exchange or manipulation of its stock or of any securities owned by it; (2) for the appointment of a receiver and the stay of any and all actions or proceedings which might interfere with his management and possession; (3) for an injunction restraining defendants from selling or disposing or in any manner interfering with the property of Quarterly; (4) that the court direct the calling of a meeting of stockholders for the purpose of electing directors who will not be controlled by the defendants; and (5) for such other relief as equity may require.

The cause of action attempted to be alleged is not different from that which was considered in my previous opinion. It is based upon an alleged conspiracy between the defendants to cause Quarterly to be incorporated by them, and to cause themselves to be elected as officers and directors and in control thereof, without the necessity of any considerable investment of their personal funds, under a certificate of incorporation containing certain exculpatory clauses protecting the defendants against dealings between themselves and corporations controlled by them, pursuant to which conspiracy Quarterly entered into two contracts, one an underwriting agreement dated December 12, 1932 between it and Administrative and Research Corporation (Maryland) now the defendant Maryland Sponsers, Inc. and hereinafter called the Maryland Corporation, also controlled by the defendants, and two, a management advisory contract dated August 23, 1934 between Quarterly and Administrative and Research Corporation (New York), hereinafter called Administrative of New York, also controlled by them, for the purpose and under both of which the individual defendants received allegedly exorbitant and unconscionable salaries, fees and secret profits. As a part of the conspiracy, it is also alleged that the Maryland Corporation controlled by the individual defendants, contracted for the wholesale distribution of Quarterly shares with Ross Beason & Co. Inc. and Ross Beason & Company of California, both organized by the defendant Ross Beason, and in which he was a majority stockholder, and with Smith, Burris & Co. Inc., of which Cedric H. Smith was an officer, and which three last mentioned corporations owned all or practically all of the capital stock of the Maryland Corporation and wholesaled said shares to retail brokers for resale to the public. It is further claimed that the defendants made false and misleading representations that the Maryland Corporation was not controlled by or under common control with Quarterly, that no remuneration would be paid to its officers and directors and that in the judgment of the Board of Directors of Quarterly, the management contract of 1934 with Administrative of New York would be advantageous and desirable, the cost of such service would be limited, and the basis of compensation would be an incentive to preserve and increase the asset value, and that the service corporation was one in which the board had complete confidence. It is also charged that the defendants did not make a full and honest disclosure of the facts at the time when the management and advisory contract was authorized; that although they stated no remuneration

was paid to officers and directors of Quarterly, yet provision for such payment was provided for in the management contract with Administrative of New York by which that corporation would pay such remuneration.

It will thus be seen that the second amended complaint is based upon an alleged conspiracy, consummated by the two contracts mentioned, and what the defendants did under them; it being claimed that these agreements were made by the defendants with themselves without an adequate revelation of the facts to the stockholders, that by their intercorporate and interlocking affiliations, they were enabled to and did make profits in matters in which they were charged with a fiduciary relationship, and in matters which could just as well have been handled without the intervention of the contracts, because the same individuals in each corporation conducted the affairs of all.

As a partial defense, the moving defendants plead that the Maryland Corporation which, prior to December 1932 had been engaged in the business of sponsoring and creating so-called investment trusts and distributing their shares to the investing public, in that month sponsored the incorporation of Quarterly for the purpose of selling and distributing its shares which would represent an investment having some of the features of fixed trusts, but being in certain respects an improved and better kind of investment; that there were inserted in the certificate of incorporation provisions expressly authorizing Quarterly to enter into contracts with the Maryland Corporation for the sale and distribution of the capital stock of Quarterly, and that the validity of such contracts should not be affected by the fact that the directors or officers of Quarterly were directors or officers or otherwise interested in the Maryland Corporation; that by the underwriting agreement of December 12, 1932, the Maryland Corporation was to receive as commission on sales nine and one-half per cent. of the net asset value of the stock sold, which was equivalent· to approximately eight and two-thirds per cent. of the selling price, of which the Maryland Corporation actually received as its gross share about one and one-sixth per cent., retailers received five per cent., and the wholesalers Smith Burris & Company and the two Beason Corporations two and one-half per cent; that the sale and distribution of the stock were terminated on February 28, 1935, and there were sold 25,-800,000 shares to more than thirty-one thousand investors, for which Quarterly received in excess of $32,000,000, the Maryland Corporation $489,000, the wholesalers $862,000, and the retailers about $1,790,000, all of which moneys were received more than six years prior to the institution of this action; that Quarterly took steps which were reasonably calculated to inform each of the persons who purchased the stock, of the material facts with reference to the underwriting agreement and . of the relationship between the officers and directors of Quarterly and the Maryland Corporation; that the provisions of the underwriting agreement were not challenged by any of the stockholders of Quarterly until the beginning of this action, but, on the contrary, they acquiesced, approved and ratified the execution and performance of the underwriting agreement; and that the management contract of August 23, 1934 between Quarterly and Administrative of New York, was authorized at a special meeting of stockholders after full disclosure of all material facts, and on February 14, 1939, the stockholders at a meeting, ratified the same as amended after a full disclosure of all material facts; that the full amount paid to Administrative of New York under that contract has been about $1,000,000 subject to the expenses involved and to payments made to Quarterly to cover certain operating expenses, and no stockholder has challenged the contract until the commencement of this suit.

A second partial defense pleads the six year statute of limitations; and a third partial defense, that plaintiff purchased her stock with knowledge of the material facts concerning the underwriting agreement and the relationship between the directors and management of the two companies, and from the time of purchase on January 16, 1934, received dividends, exercised her rights under the stock without challenging the validity of the agreement, authorized by proxy a vote in favor of the management contract, and her stock was so voted, and also in favor of ratifying that contract in 1939; and by her acts and proceedings, it is alleged, she is estopped and barred from asserting the claims alleged in her complaint.

It is admitted by the plaintiff's brief that there is no substantial dispute as to the facts, which are as follows:

Quarterly was organized in Maryland on December 9, 1932. The two Beason Corporations were organized by Ross Beason in 1929 and continued in business until 1937, when they were dissolved. The Maryland Corporation was incorporated in 1929 in Maryland by the defendant Ross Beason and Cedric H. Smith, under the name of Administrative and Research Corporation (Maryland) and changed its name as at present on October 24, 1935. One-third of its stock was owned by each of the Beason Corporations until their dissolution and the other one-third to the greater extent by Smith, Burris & Company, Inc., of which Cedric H. Smith was an officer and director. The defendant Administrative of New York was incorporated in New York by Beason, Smith and others of the defendants some time prior to June 8, 1934, on which date it assumed its present name and was authorized to engage in the business of investment advisor. Ninety-six per cent. of its capital stock is owned and the corporation is controlled by the Maryland Corporation.

The certificate of incorporation of Quarterly gave it power, among others, to purchase and acquire, hold for investment or otherwise, and sell or otherwise dispose of securities of certain companies, including the right to purchase or otherwise acquire for temporary investment trust shares of any investment trust. The directors until the first annual meeting were Ross Beason, Cedric H. Smith, Benjamin F. Castle, Thomas F. McJilton and Lawrence W. Schmidt. It contained certain restrictions upon its officers and directors individually or with any firm with which any officer or director may be a member, or with any corporation or joint stock association of which any of the corporation's officers or directors may be an officer or director, in dealing as principals in making purchases or sales of securities, other than stock or other securities which may be issued by the corporation; but any officer or director of this corporation, either directly or through partnership, association or corporation, might act as broker and accept the customary brokerage commissions in the purchase or sale of securities for account of the corporation, and might purchase or sell, or act as banker or underwriter in connection with the sale of, stock, warrants and any other securities issued by the corporation; and each officer or director of the corporation was relieved from any liability that might otherwise

exist from contracting, as aforesaid, with the corporation for the benefit of himself or any partnership, association or corporation in which he might be interested. And subject only to the provisions just mentioned any director or officer individually, or any firm of which any director or officer may be a member, or any corporation or joint-stock association of which any director or officer may be an officer, director or stockholder, might be a party to, or interested in, any contract or transaction of the Corporation, and in the absence of fraud no contract or other transaction would be thereby affected or invalidated, provided such interest should be disclosed or known to the Board of Directors or a majority of the members thereof. It further provided that the corporation might enter into any contract with and otherwise do business with, the Maryland Corporation, notwithstanding that the board of directors of Quarterly might be composed entirely or partly of directors or stockholders of the Maryland Corporation, and in the absence of fraud might deal freely with each other, and no contract or transaction between Quarterly and the Maryland Corporation should be invalidated or affected thereby, nor should any director or officer of Quarterly be liable to it or to any of its stockholders, creditors, or any other person, for any loss incurred by it or him under or by reason of any such contract or transaction; provided always that such contract or transaction shall have been on terms that were not unfair at the time at which it was entered into.

When Quarterly was incorporated Ross Beason, Cedric H. Smith, Benjamin F. Castle and Thomas J. McJilton were officers and directors and Lawrence W. Schmidt the secretary and treasurer of the Maryland Corporation, which then sponsored Quarterly, and they also became officers and directors of Quarterly.

On December 12, 1932, three days after its incorporation, the underwriting contract was made between Quarterly and the Maryland Corporation, which was appointed exclusive selling agent of Quarterly's stock for ten years, and it agreed to pay $5,000 in cash forthwith, to purchase 100,000 shares of Quarterly for $108,000, and was authorized to appoint sub-agents or distribute through dealers or otherwise. Shares were to be offered at a price equivalent to their then liquidating value plus a premium not exceeding $9\frac{1}{2}\%$ of such

value, and the Maryland Corporation was to pay to the Commercial Trust Company of New Jersey, the trustee appointed by Quarterly, an amount in cash equal to the liquidating value aforesaid, and the balance of the selling price was payable to it as distributing commission. In addition to the amounts mentioned, the Maryland Corporation also agreed to pay all of the initial organization expenses of Quarterly, including taxes and counsel fees, and any expenses of initially qualifying the shares for sale.

Sales of stock under this agreement were completed and the contract terminated by agreement of the parties on February 28, 1935, and all commissions provided for were actually paid on or before April 15, 1935, all more than six years prior to the commencement of this action on August 14, 1941.

█ It is to be noted that plaintiff was not a stockholder at the time the underwriting agreement was entered into, and did not become such until January 16, 1934. It is doubtful, therefore, if she can complain thereof. Rule 23(b) (1). She could complain, if at all, only as to transactions thereunder after she became a stockholder. Bachrach v. General Inv. Corporation, D.C., 29 F.Supp. 966; Piccard v. Sperry Corporation, D.C., 36 F.Supp. 1006–1010, affirmed 2 Cir., 120 F.2d 328; Lissauer v. Bertles, D.C., 37 F.Supp. 881–884.

At the directors meeting of Quarterly at which the underwriting contract was authorized, it was pointed out that all its directors were also officers or directors of or otherwise connected with the Maryland Corporation. The registration statement filed by Quarterly with the Federal Trade Commission on July 7, 1933, stated that the corporation was organized under the supervision of the Maryland Corporation, that the underwriting contract had been made and a copy thereof was filed with the statement, named the two Beason Corporations and Smith, Burris & Company as wholesale distributors, and a copy of that contract was also filed, stated that the Maryland Corporation had purchased and owned 100,000 shares of Quarterly, and that the directors of Quarterly and members of their immediate families held in excess of 55% of the outstanding shares of the Maryland Corporation. A copy of Quarterly's certificate of incorporation and of its by-laws were also filed with the statement, which also informed the Commission that

no remuneration had been paid to the directors or officers of the corporation, that the by-laws provided that no compensation should be paid to the directors and no provision had been made to date for the payment of compensation to officers. Its prospectus dated July 27, 1933, stated, among other matters, that its shares were offered from time to time at a price equal to their then current liquidating value plus a premium of 9½% to cover costs and profits of distribution, that being the total commission paid the Maryland Corporation, a portion of which would be allowed to the wholesale distributors and reallowed to others. The underwriting contract is mentioned whereby the Maryland Corporation was appointed exclusive distributing agent, a list of the officers and directors is set forth, the same statements are made as to remuneration, and attention is called to the holdings by the directors and their immediate families a 55% interest in the distributing corporation. It contained further statement that neither the Maryland Corporation nor the wholesale distributors was controlled by or under common control with Quarterly. The prospectus of July 27, 1933, was revised as of November 15, 1933, and contained substantially the same information.

The prospectus of February 3, 1934, a supplement to which was added on August 24, 1934, during which period plaintiff purchased her shares, contained information as to the underwriting contract, who the wholesale distributors were, the cost of the shares, plus the 9½%, that of the total premiums paid to Maryland Corporation of 9½%, 7½% was reallowed to wholesale distributors, who, in turn, allowed 5% to authorized distributors, as to the fact of the non-payment of salaries to officers and directors, and that the corporation paid no management fees or expenses. It sets forth the amounts paid the Maryland Corporation for gross commissions and the amount paid by that corporation to the three wholesale distributors, as well as their stock holdings in the corporation, and also that no underwriter is controlled by, or is under common control with Quarterly; that stockholders and directors of the Maryland Corporation, and of the wholesale distributors were in certain instances directors of Quarterly; that Ross Beason, president and director of Quarterly, was an officer and director and interested in the Maryland Corporation, the two Beason Cor-

porations and Administrative of New York; that Benjamin F. Castle was a director and vice president of Quarterly and an officer and director and interested in the stock of the Maryland Corporation and a director of the California Beason Corporation; that Bernard E. Lawson was a director, vice president and assistant treasurer of Quarterly, and was formerly employed by the Maryland Corporation; that Lawrence W. Schmidt was a director, secretary and treasurer of Quarterly and an officer and director of the Maryland Corporation and of Administrative of New York; and that Cedric H. Smith was a director and vice president of Quarterly, and an officer and director in the Maryland Corporation and Administrative of New York, as well as in Smith. Burris & Company. And there are also copied into that prospectus the provisions mentioned above from the certificate of incorporation of Quarterly.

For the first time, notice is given that Quarterly had entered into the management contract of August 23, 1934 with Administrative of New York for investment advisory service, and that it was to reimburse Quarterly for salaries, directors' fees, and travelling expenses and rent for the chief office to the extent that Administrative of New York deemed such sums to be reasonable. The compensation to be paid is set forth, that the agreement is to continue until October 15, 1939, and thereafter during five year periods until terminated. The statement is also made that the by-laws of the corporation as amended, authorize the Board of Directors to fix the compensation of its members, and there are also set out the amounts paid by Quarterly to the Maryland Corporation, Administrative of New York, the two Beason Corporations and Smith, Burris & Company (the last three being treated as affiliates) and to the directors Beason, Castle, Lawson, Schmidt, Smith and others. A complete statement of the interrelations and intercorporate set up of the several corporations mentioned is given, as well as the positions occupied by the several individual defendants in each of the corporations referred to. It further states that no underwriter is controlled by or controls or is under common control with Quarterly through stock ownership; that at the date, one or more of the Maryland Corporations, the Beason Corporations, and Smith, Burris & Company controlled or are under common control with Quarterly; that the Maryland Corporation is under common control with the Beason Corporations and Smith, Burris & Company; that officers and directors of Quarterly are officers or directors or otherwise interested in the Beason Corporations, Smith, Burris & Company, the Maryland Corporation and Administrative of New York, all of the stock of which last named company was on July 25, 1934 owned by the Maryland Corporation. It sets out fully the names of the directors and principal officers of those corporations, and that list shows that Beason was the president and director of the Maryland Corporation, Administrative of New York and the two Beason Corporations, that Cedric H. Smith was an officer and director of the Maryland Corporation, Administrative of New York and of Smith, Burris & Company, that Lawrence W. Schmidt was the secretary of the Maryland Corporation and secretary and director of Administrative of New York; that Benjamin F. Castle was a vice president and director of the Maryland Corporation and Administrative of New York, as well as of the Beason Corporation of California.

The special meeting of stockholders of Quarterly called for August 21, 1934, was adjourned to August 23, 1934. Five stockholders representing 19,771 shares were present in person, and more than 51% of the total shares outstanding were represented in person or by proxy. There were 21,104,599 shares outstanding. The affidavit of service of the notice of the meeting upon all of the stockholders of record as of July 25, 1934 is attached to the minutes of the meeting, as is also the notice, and a copy of a letter written to the stockholders. Notice was given that action would be taken upon amendments of the by-laws authorizing, among others, the board of directors by two-thirds vote of the entire board to fix the compensation of its members and provide for their expenses in attending meetings; of the proposed management advisory agreement with Administrative of New York and a brief resume of its terms which included the period it was to run, the reimbursement to Quarterly for the salaries, etc., and that Quarterly was to pay Administrative of New York $\frac{1}{8}$ of 1% of the average of the daily amounts of net assets during such period. It also stated that six of the eight directors of Quarterly, as well as the persons named in the proxy accompanying the notice, were officers or directors

of or had direct or indirect stock interests in Administrative of New York. The letter accompanying the notice mentioned the same matter, that it was the opinion of the board that it would be advisable, from the standpoint of the stockholders, to permit Quarterly to pay reasonable compensation to its directors and to reimburse them for travelling expenses in attending meetings, which would be reimbursed by Administrative of New York under the proposed management agreement, as to which it was stated that in the judgment of the Board that proposed arrangement would be advantageous to Quarterly, and desirable from the standpoint of investors because the cost to Quarterly of the services would be limited, based upon a known percentage of its net assets, thus providing an incentive to preserve and increase asset values. It was stated that the Board had complete confidence in the proposed investment advisory service organization which had entered into a substantially identical agreement with Maryland, Inc., an investment corporation organized by the Maryland Corporation. Specific mention was made that six of the eight directors and a number of the officers of Quarterly were directors and officers and directly or indirectly interested in both the Maryland Corporation and Administrative of New York.

Holders of record of 14,747,924 shares out of a total of 21,104,599 were present in person or represented by proxy. The various matters contained in the notice were presented to the meeting and all were adopted by vote of 14,742,424 in favor and 5500 against. There was spread upon the minutes the names of the several officers and directors of the corporation, together with their positions in the Maryland Corporation and Administrative of New York.

■ The proxy signed by the plaintiff on August 16, 1934, for that meeting appointed Ross Beason, J. McJilton, Lawrence W. Schmidt and Francis A. Fullham, Jr., and each of them proxies, authorized them to vote in favor of the amendment and charter and by-laws; and in favor of the proposed advisory agreement with Administrative of New York. Her stock was so voted, and its use was as effective as if she had voted in person. McClean v. Bradley, 6 Cir., 299 F. 379–384, certiorari denied 266 U.S. 619, 45 S.Ct. 98, 69 L.Ed. 471; Gray v. Aspironal Laboratories, 5 Cir., 24 F.2d 97.

The annual meeting of the stockholders of Quarterly was held on February 14, 1939. It was shown that there were then outstanding 2,391,426 shares. Proof of the service of notice of meeting upon all stockholders of record as of January 14, 1939, was also filed. 1,441,593 shares were present in person or by proxy. The chairman stated that at a special meeting of the Board of Directors held September 22, 1937, the advisory service agreement of August 23, 1934 had been amended so as to exclude from liabilities, in the determination of the amount of net assets of the corporation upon which compensation was based, the principal amount outstanding of bonds, debentures and other obligations of a similar nature of the corporation, and a copy of that amendment was submitted to the meeting. The action of the board in so amending the agreement was in all respects ratified and confirmed, 1,362,068 shares voting in favor and 79,525 shares against. Ross Beason, Cedric H. Smith, Bernard E. Lawson, Harold F. Dugan and Lincoln R. Ure were elected directors. The notice of the meeting stated that it was called for the purpose of electing directors and for approval of the amendment to the advisory agreement mentioned. The names of the directors who would be proposed for election are therein stated, as well as their affiliations and stock interests in the other corporations. Plaintiff signed her proxy for that meeting on January 26, 1939, and appointed Ross Beason, Cedric H. Smith, Bernard E. Lawson, Harold F. Dugan and Wallace A. Bong and each of them as her proxies to vote her stock in favor of the approval of the amendment to the advisory agreement and the election of the directors mentioned, and it was so voted.

The annual reports rendered by Quarterly subsequent to plaintiff becoming a stockholder, make mention of the management contract and show the amount of fees paid to Administrative of New York in each of the years ending October 15, 1934, 1935, 1936, 1937, 1938, 1939 and 1940, as well as the amount of commissions paid during 1934 and 1935 under the underwriting agreement of 1932.

■ These facts show clearly that there was no concealment of the intercorporate and interlocking directors and of the joint interests of the several individual defendants in the companies which were dealing with each other. These were all divulged as

a matter of record with the Federal Trade Commission, and were authorized by appropriate language in the certificate of incorporation of Quarterly. And full information of the amounts spent, both under the underwriting agreement as well as under the management contract, was furnished to the stockholders, including plaintiff annually. She authorized a vote in favor of the management contract and later in favor of the amendment thereto, which, in my opinion, in all respects ratified the same. None of these facts shown are in any way controverted. And it is not shown that the selling commissions or the salaries or profits received by the corporations and individuals now defendants, were in any way exorbitant or unconscionable. Such testimony as there is is to the contrary. In fact it is not shown what salaries were paid. Certainly no fraud is alleged or proven. Rule 9(b), Federal Rules of Civil Procedure; Brackett v. Griswold, 112 N.Y. 454, 20 N.E. 376.

The remaining questions then, are (1) whether or not plaintiff's alleged cause of action, arising out of the underwriting contract, is barred by the six year statute of limitation (N.Y. Civil Practice Act § 48, subd. 3); (2) whether or not she has ratified the management contract; (3) whether, in view of that ratification, plaintiff is estopped from maintaining the action; and (4) whether or not the management contract, in view of the fact that it was made between two corporations whose directors and officers were practically identical, could legally be made or legally ratified.

It is clear that all transactions under the underwriting contract of 1932 were ended more than six years prior to the commencement of this action on August 14, 1941.

■ Where an equitable and a legal remedy exists as to the same subject matter, the equitable remedy is under the control of the same statutory bar as the legal, and the fact that plaintiff is ignorant of what precisely she was entitled to claim is immaterial. Keys v. Leopold, 241 N.Y. 189–193, 149 N.E. 828; Baker v. Cummings, 169 U.S. 189–206, 18 S.Ct. 367, 42 L.Ed. 711. And where the loss to the corporation equals the profit or gain made by the persons charged with wrongdoing, the six year statute (N.Y. Civil Practice Act, § 48) is applicable rather than the ten year statute (Id. Section 53). The amount paid

for commissions under the underwriting contract is definite and ascertainable, and in fact is set forth in the annual reports to stockholders of Quarterly. Similarly the salaries paid are likewise definite and ascertainable. I think, therefore, that this action, insofar as it is based on the underwriting contract, is barred by the six year statute. The alleged loss to Quarterly is substantially the same as the gain claimed to have been received by defendants. Dunlop's Sons v. Spurr, 285 N.Y. 333–336, 34 N.E.2d 344; Singer v. Carlisle, Sup., 26 N.Y.S.2d 172–178, affirmed without opinion 261 App.Div. 897, 26 N.Y.S.2d 320; Cwerdinski v. Bent, 256 App.Div. 612, 11 N.Y.S.2d 208. Under the circumstances, the cases of Potter v. Walker, 276 N.Y. 15–25, 11 N.E.2d 335 and Goldstein v. Tri-Continental Corp., 282 N.Y. 21–30, 24 N.E.2d 728, would not be decisive.

■■ But whether the statute of limitations is a bar or not, it is clear that there is no cause of action because of that contract. Plaintiff, after she became a stockholder, was advised of expenditures thereunder and acquiesced therein for more than six years, and she has not shown that the amounts paid during the time she was a stockholder were exorbitant or unconscionable. During the entire period she knew that the officers and directors of Quarterly were officers and directors of the Maryland Corporation and of the wholesale distributors. No attempt was made to conceal that from her, or from any other stockholder. The contract was authorized by the certificate of incorporation, and while it is common knowledge that such certificates are seldom examined by purchasers of stock, their provisions are legally binding upon such purchasers. Hazzard v. Chase National Bank, 159 Misc. 57–60, 287 N.Y.S. 541; Id., 257 App.Div. 950, 14 N.Y.S.2d 147, affirmed 282 N.Y. 652, 26 N.E.2d 801; Everett v. Phillips, 288 N.Y. 227–237, 43 N.E.2d 18; Benton v. Safe Deposit Bank, 255 N.Y. 260–265, 174 N.E. 648. For any or all of these reasons, the action must fail as to that agreement.

■ There can be no question in my mind but that she has in all respects approved the management contract of 1934, and ratified it by the vote of her stock in 1939. She cannot complain of what she expressly authorized or acquiesced in. McClean v. Bradley, 6 Cir., 299 F. 379-384; Gray v. Aspironal Laboratories, 5 Cir., 24 F.2d 97; Allen v. Wilson, C.C., 28 F. 677;

820

Robertson v. Schoonmaker, 158 Misc. 627–636–646, 285 N.Y.S. 204.

■ No other stockholder has intervened during the two years the action has been pending, and it has been held that the action cannot be maintained by one who is estopped. Johnson v. King-Richardson Co., 1 Cir., 36 F.2d 675–678, 67 A.L.R. 1465.

■ Assuming, again, that I am wrong, it is shown without dispute that the management contract was authorized by more than two-thirds of the stockholders. Reports of the expenditures thereunder, the relations of the officers and directors of Quarterly and Administrative of New York, the fact that the two corporations were practically one insofar as directors and officers were concerned, the absence of any proof that the amount paid was exorbitant or unconscionable (although opportunity for an examination of the books and records of both corporations was given to plaintiff under a previous order and availed of by her for a period of several months), and proof of a kind that the amount paid for management service did not exceed what many other corporations of a similar character were paying for similar services, as well as the fact that information concerning all of these matters was filed with the proper governmental authority and revealed to Quarterly's stockholders annually over the six years elapsing between the making of the contract and the commencement of this action, would seem to me to be adequate reason for denying any relief to plaintiff or to any other stockholder in this action.

■ There can be no doubt that, under the circumstances proven here, the individual defendants, as well as the defendant corporation (other than American Depositor Corporation, as to which there is no proof of any kind) were acting in a fiduciary capacity. But the law does not condemn them solely because of that fact. Where what they do is communicated to those interested as is shown to have been done here, and where acquiescence for six years is also shown without anyone questioning the acts until the commencement of this action, and then only by a stockholder owning 30 shares out of more than 2,300,-000 shares (which, of course, would have no significance where facts justifying interference are shown) I do not see how there can be any other result than a dis-

missal of the complaint. Pollitz v. Wabash R. Co., 207 N.Y. 113–127, 100 N.E. 721; City Bank F. T. Co. v. Hewitt Realty Co., 257 N.Y. 62–68, 177 N.E. 309; Continental Ins. Co. v. N.Y. & H. R. Co., 187 N.Y. 225–238, 79 N.E. 1026; Goldstein v. Tri-Continental Corp., 282 N.Y. 21–28, 24 N.E. 2d 728.

I am all the more confirmed in my conclusions by other facts appearing. The order permitting plaintiff a discovery, inspection and examination of the defendants for the purpose of presenting facts in opposition to a motion for summary judgment was made more than a year ago. A stipulation was entered into permitting such a discovery and inspection on May 9, 1942. At about the same time, plaintiff gave notice of the examination of the defendant. On May 19, 1942 the discovery and inspection of the books of Quarterly, Administrative of New York and Maryland Corporation began and continued for a period of about five months until October 7, 1942, when the defendants refused further opportunity. Whether or not that refusal was justified, it is not necessary to decide. Plaintiff had the right to come to this court for an order directing its continuance, if such continuance were proper. She has never taken any steps under her notice to examine the defendants orally, but has had several adjournments thereof, and when advised that no further adjournment would be granted, wilfully defaulted on the day to which the hearing had been adjourned, which was October 7, 1942. Nothing further was done to obtain such oral examination until motion papers were served by the defendant on March 9, 1943.

Notwithstanding the discovery and inspection extending over the period mentioned, not one fact has been called to the attention of this court by the plaintiff which had not been revealed upon the previous motion for summary judgment, nor which has not now been revealed by the defendants in their present motion. It is perfectly obvious that nothing was discovered which could have been used in opposition to the former motion.

Application for a further discovery, inspection and examination is not now made under Section 56(f) of the rules, so that plaintiff does not now claim inability to produce facts to oppose this present motion. Her motion now before the court is obviously an effort to prolong this litigation, now pending since August 14, 1941.

And the motion papers seem to confirm my statement. She seeks under subdivision 1(a) of her motion, inspection of the minute books of Quarterly and Maryland Corporation relating to the underwriting agreement. That such an agreement was made is alleged by her and admitted by the defendants and is not in dispute; and the fact that sales of stock have been made thereunder is also alleged, admitted and undisputed. The challenge is that the amount paid is exorbitant. It is difficult to see how an inspection would assist upon that question.

In subdivision 1(b), she asks a list of stockholders, directors and officers of the Maryland Corporation from December 9, 1932 (before she became a stockholder) to date, showing details of purchases and acquisitions of trust shares sponsored by it and sold to Quarterly or exchanged for Quarterly stock. This information is probably sought under her allegation that purchases only could be made. But the certificate of Quarterly expressly authorizes it "to purchase or otherwise acquire" shares of any investment trust for temporary investment. And it would seem more than probable that transactions of this kind could have been discovered during the period of inspection and discovery which plaintiff has already had. This same comment might be made about her request for an inspection of books, etc. showing brokerage commissions paid to the Maryland Corporation in connection with any trades in trust shares sponsored by the Maryland Corporation or to Beason and his associates.

In subdivision 1(d) she asks discovery of the minute books of Administrative of New York and the Maryland Corporation with reference to the management contract of 1934, the amendment thereto in 1937, and the meeting at which the amendment was ratified in 1939. There is no dispute about any of those meetings and all facts relating thereto have been set forth in the motion papers now before the court and before the court on the last motion.

In subdivisions 1(e) and (f) discovery is asked of books, records and correspondence between Quarterly and Administrative of New York with reference to the performance by Administrative of New York under the management contract mentioned, and

what was done by Quarterly as a result thereof. The contract having concededly been authorized by a vote of stockholders, including the stock of plaintiff, and reports of operations thereunder having been made over a period of six years, an opportunity to make such inspection having been ordered and granted by stipulation and to some considerable extent availed of by plaintiff, and many of the facts relating thereto being conceded, it is difficult to see why there should be further delay.

In subdivision 1(h) plaintiff seeks a further examination of the books and records of Quarterly and Administrative of New York, showing salaries paid to officers of Quarterly, and traveling expenses paid to its directors, and rent paid for its chief office, and a copy of the lease for the same, for which Administrative of New York agreed to reimburse Quarterly. It is difficult to see how these facts would have any material bearing upon the issues now before the court.

And, finally, in subdivision 1(i), she asks a discovery and inspection of all other books, records, documents and papers of the defendants not privileged, which constitute or contain evidence material and necessary to the matters involved in this controversy; and in Section 2 of her notice of motion, she asks for an order directing that the defendants proceed under the notice to take depositions under which plaintiff defaulted in October 1942.

█ In view of the lapse of more than one year since the last motion for summary judgment was denied, the opportunity which plaintiff has had to inspect and of which she availed herself for nearly five months, the examination of which she did not avail herself, and of the fact that if she had been improperly or arbitrarily denied any of those privileges, such deprivation or denial occurred last October, since which time she has had plenty of opportunity to apply to this court for whatever relief she may have been entitled to, her motion now comes with ill grace and convinces me that it is not made in good faith but solely to prolong this litigation.

The motion for summary judgment is granted and the plaintiff's motion for a discovery and examination is denied. Settle order on notice.